**In re Linda J. WARGO & Edward M. Wargo, Debtors.**

**Linda J. Wargo & Edward M. Wargo, Plaintiffs,**

**v.**

**United States of America, Defendant.**

**Bankruptcy No. 01–2837–8B7.**

**Adversary No. 01–498.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

March 18, 2005.

Sheila D. Norman, Office of Harvey P. Muslin, PA, Tampa, FL, for Debtors and Plaintiffs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THOMAS E. BAYNES, JR., Bankruptcy Judge.

THIS CAUSE came on for final evidentiary hearing on the Amended Complaint to Determine the Dischargeability of a Debt filed by Plaintiffs/Debtors Linda and Edward M. Wargo ("Debtor(s)") in the above captioned case. The United States of America, representing the Internal Rev-

enue Service ("IRS"), filed an Answer and a Motion for Summary Judgment. The Court, having considered arguments by counsel, the entire record of this case, testimony of live witnesses, and all other relevant evidence, enters the following findings of fact and conclusions of law. *See* **Fed.R.Civ.P.** 52; **Fed. R. Bankr.P.** 7052.

## IRS MOTION FOR SUMMARY JUDGMENT DENIED

Prior to trial, the IRS filed a Motion for Summary Judgment. The Court heard argument on the Motion at the start of trial, and gave the parties the option go forward with the evidence or have the Court rule on the summary judgment and return for trial at a later date. The Court advised the parties of the likelihood the Court might deny the summary judgment motion and proceed on the evidence in the event they chose to go ahead with trial. The Court rules the summary judgment motion shall be denied and enters the following findings of fact and conclusions of law on the Debtors' Complaint and the IRS' Answer.

## FINDINGS OF FACT

The relevant facts in this case are relatively straightforward, even if the circumstances giving rise to them are not so simple. The Debtors owe income taxes, penalties and interest for the years 1982 through 1996 consecutively, due entirely to their participation in a tax shelter. The limited partnership tax shelter was engineered by Walter J. Hoyt ("Hoyt"). The Debtors became limited partners with Hoyt in the cattle business, seemingly by exchanging their tax refunds for the ability to write off their income against the cattle

business losses and for access to free professional tax preparation services and advice. The Debtors entered into agreements obligating them to pay substantial amounts to Hoyt, though the exact nature of the obligations are not clear to Debtors at the time, nor are the details easy to ascertain from reviewing the documents Debtor's signed with Hoyt.[1]

## DEBTORS' TESTIMONY

During the years in question, the Debtors always filed timely tax returns reflecting all of their income. There is no evidence the Debtors ever tried to conceal any earnings from the IRS during the tax shelter years. In the years at issue, Debtors prepared their returns and submitted them to a tax service run by Hoyt for review. During the review, the tax service run by Hoyt added the necessary paperwork to include the limited partnership losses.

Whether or not Debtors received their claimed refunds from the IRS, Debtors remained obligated to pay the Hoyt limited partnership. For the first years Hoyt simply accepted the refund amount as payment toward Debtors' obligations. Relatively early on in the relationship, the Hoyt limited partnership began asking Debtors for periodic payments throughout the year as opposed to waiting to claim their refund. The Debtors' obligations to Hoyt are substantial: one contract reflects a $107,000.00 obligation (Def.Ex. 19), another $283,000.00 (Def.Ex. 20), the third and final in the record $55,000.00 (Def.Ex. 21).

On May 9, 1989, Debtors receive a form letter stating the IRS has advised Hoyt, as Tax Matters Partner for the limited part-

1. A more detailed examination of the tax shelter appears in the Conclusions of Law section below.

nerships,[2] of the IRS' "belief" the deductions and/or credits are not allowable. The letter warns Debtors taxpayers who take these deductions and/or credits in connection with the limited partnership will have their returns examined and the deductions and/or credits disallowed. As a result, the taxpayer(s)' tax liability may be subject to various penalties, including a negligence penalty, an overvaluation penalty and/or a substantial understatement of income penalty.

Sometime in the late 1980's and early 1990's, the IRS begins to place holds on the Debtors' refunds. The record reflects Debtors received a total of 5 additional form letters in the ten or eleven years of their participation in reference to the refunds. These letters, the first of which is not sent to Debtors until February 19, 1993, are identical to each other, but differ from the 1989 letter. (The second IRS form letters arrive in 1993, 1994, 1995, 1996 and 1998.) The letters identify Hoyt as the promoter of the tax shelter partnership, and advises Debtors in relevant part,

> We believe that tax shelter deductions and/or credits from such tax shelter partnerships will not be allowable and an examination will be conducted when the returns are filed.
>
> . . . .
>
> If you file your return claiming a refund, such refund will be reduced for the amount generated by claiming deductions and/or credits from any Hoyt partnership tax shelter.

Def. Ex. 22. The last letter is dated March 5, 1998. These letters also warn Debtors of the potential for accuracy-related penalties. The Court notes none of the letters apprise Debtors of any potential fraud penalties, civil or criminal.

When the refunds were placed on hold, Hoyt still demanded payment and advised Debtors to decrease their withholding in anticipation of a favorable determination by the IRS with regard to allowing the tax shelter as legitimate. At some point, the Hoyt tax preparation services company began to prepare forms W–4 with a greater number of exemptions, sending the pre-completed forms to Debtors with their other tax forms. The Debtors were simply to sign the forms and give them to their employers.

The actual number of exemptions claimed by the Debtors on any W4 is not in evidence, as there are no forms W4 in this record. The tax returns and W2 for each year was reviewed on the record with Debtor Edward Wargo, who freely admits the Debtors accepted the advice of the Hoyt tax service in reliance on their assurances of the legitimacy and necessity of the adjustment to enable Debtors to meet their obligations to the Hoyt limited partnerships. Referring to the decreased withholding as use of the "Hoyt formula," Debtor Edward Wargo acknowledges either his and/or his wife's withholding fell below ten percent (10%) in each year between 1987 and 1995.

However, every W2 filed between 1987 and 1995 does not reflect less than ten percent withholding. Sometime in 1989, one of Debtor Edward Wargo's employers, Dickey Electric, (as a subcontractor, he often worked for more than one employer in any given year) received notice from the IRS that the number of exemptions claimed on his W4. The IRS directed Dickey Electric to ignore the claimed exemptions and withhold more from the paycheck, which the employer did with Debtor Edward Wargo's consent. When the Debtors contacted the Hoyt tax prepara-

---

**2.** Tax Matters Partner is a defined role in relation to the IRS, and is discussed in more detail in the Conclusions of Law section below.

tion service about the IRS intervention with regard to the claimed exemptions, they were assured the IRS was out of line in taking this action and that the Hoyt tax experts would contact the IRS on the matter.

The IRS never contacted the Debtors directly about the number of exemptions claimed on this W4, or any other W4, for any of the years in question. Apparently as a result of the IRS intervention, greater than ten percent was withheld on Debtor Edward Wargo's income from Dickey Electric in 1989, 1990, 1994 and 1995. In 1990, Dickey Electric provided 100% of Debtor Edward Wargo's income, so there was no use of the Hoyt formula for his wages in that tax year.[3] Debtor never questioned the IRS change to withhold more of his income, nor did he challenge it in anyway, he simply complied.

Debtor Edward Wargo testifies in his experience as a journeyman electrician the practice of increasing the number of exemptions in order to retain more money from a job was common in construction related fields such as his own. He testifies he understood the practice of adjusting exemptions on a form W4 was permissible in certain circumstances, such as in anticipation of long periods between jobs, or when a job was unusually lucrative and not typical of what he anticipated he would earn during the year. However, he freely admits these are not the reasons the with-

holding is adjusted in the tax years at issue in this case. He offers the information to clarify his understanding of whether the practice is generally permissible outside the context of the Hoyt tax advice.

Debtor Linda Wargo, the individual who handles the majority of the Debtors' financial affairs, testifies she may recall seeing a "7" or an "8" as the number of exemptions on the Hoyt prepared forms. She is certain there was never a "10" or higher number of exemptions claimed in any year. Linda Wargo testifies she understands her bankruptcy schedules are completed under penalty of perjury, but does not recall seeing a similar statement on any of the W4's she signed. Both Debtors testified they thought the adjustment of the exemptions on the W4's was permissible under the law.

Throughout all of the years in question, the Hoyt entities maintained a very professional outfit. They sent magazines and articles with updates on the investments. They apprised Debtors in these and other communications of their successes in obtaining approval for the partnerships court rulings. There was always someone there to answer the Debtors call, and they always seemed to know what the problem was and were ready with the answer.

In July 1998, Debtors receive the first hint of the tax liability the IRS is claiming against them and begin to understand they

3. The Court's own cursory review of App. 1 to the IRS post-trial brief (a Table representing each year's income and withholding by employer for both Debtors, limiting review to the top 4 income sources for Debtor Edward Wargo) reveals only two years, 1991 and 1993, in which 100% of Debtor Edward Wargo's withholding is below 10%. In 1991, 8.4% is withheld, in 1992, 8.7% is withheld. In 1990, 1991 and 1995, 100% of his earnings have withholding rates of 10% or more. During the two remaining years after the Hoyt formula is in use, 1989 and 1992, withholding

is above 10% on roughly 50% of his earnings in 1989 and on roughly 20% of his earnings in 1992. There is one single W2 in the record, except minimal union W2's for Debtor Edward Wargo, reflecting zero dollars withholding in 1987.

Debtor Linda Wargo's W2's reflect a minimum of 1.1% in 1995 and a maximum of 8.8% in 1990. Using the figures from the IRS appendix, the Court calculates her average withholding percentage from 1987 to 1995 is 4.23%.

are in over their heads. Linda Wargo testifies she did not immediately contact the IRS because the Hoyt saga continued in the form of a Hoyt partnership defense fund formed to fight the IRS ruling on the legitimacy of the tax shelter. Also, the Hoyt tax service experts advise Debtors of the dangers of quitting the scheme, beginning in the early years by warning withdrawal makes it appear the Debtors may not be true investors, and always warning the Debtors will be facing the IRS "on their own." Debtor Edward Wargo testified these threats terrified the Debtors.

In accordance with previously made plans, the couple moves to Florida in the same time period. Liquidating their estate and buying a home here created other taxable events. Debtors paid $140,000.00 in taxes for 1998, both to the IRS and to the state of Ohio. The IRS received $62,000.00 of this amount. The Debtors mortgaged their home as collateral for a $78,000.00 loan from Debtor Linda Wargo's parents just to meet the 1998 tax obligations.

The record reflects Debtors always reported their income and paid any tax due to the best of their ability. Aside from the Hoyt tax shelter years, the Debtors paid all tax liability on time each year both before and after the investment. During the relevant tax years and beyond, Debtors paid Hoyt $147,000.00. Part of the payments to Hoyt came from a home equity loan which eventually reached $50,000.00 all borrowed to pay Hoyt.

Debtor Linda Wargo finally contacted the IRS and filled out an installment plan application and mailing in a $300.00 payment with the paperwork and each month thereafter until the IRS rejects the monthly payment amount as too small. The IRS narrative transcript reflects five $300.00 payments between June 16, 1998 and September 22, 1998. The Debtors filed for bankruptcy relief under Chapter 13 on October 22, 1998.

The record reflects the Debtors expected to be part of a global settlement of some kind with regard to Hoyt as the tax shelters affected more than 4,000 individuals. Debtor Linda Wargo testifies they allowed their 1998 Chapter 13 case to be dismissed in anticipation of participating in this type of relief. She further testified filing the bankruptcy case compromised the Debtors' ability to participate in some of the relief offered to Hoyt's victims. Finally, at some point there is a moratorium on collecting Hoyt related tax liabilities, presumably in place while the IRS addresses the issues raised in these cases.

## REVENUE OFFICER'S TESTIMONY

The only other witness at trial was IRS Revenue Officer Ray Zacek. In addition to explaining the IRS narrative transcript reflecting Debtors' tax history, Mr. Zacek testifies with regard to his understanding of withholding requirements. He testifies he "thinks" the IRS requires a taxpayer to withhold enough to meet 90% of their tax obligations. With regard to claiming an excessive number of exemptions, Mr. Zacek asserts a taxpayer can claim any number of exemptions they wish with the understanding they will face penalties if the withholding is not sufficient to cover their tax liability.

With regard to what actual number of exemptions the IRS considers to be excessive, Mr. Zacek states the he thinks the IRS Service Centers monitor the W4's and generally investigate exemptions of 10 or more. Mr. Zacek notes the IRS has the ability to send a letter to an employer questioning the legitimacy of the exemptions. He also understands the taxpayer is usually queried on the matter directly, though this communication is by corre-

spondence and may take months after the W4 is flagged to reach a taxpayer.

## CONCLUSIONS OF LAW

### 1996 Taxes are Nondischargeable

■ At trial, the Court ruled the time period for the expiration of taxes during was tolled during the pendency of Debtors' prior bankruptcy petition under 11 U.S.C. § 507(a)(8)(A)(i). *Young v. United States,* 535 U.S. 43, 54, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002). Debtors agreed the time period was tolled. Therefore, the Debtors' 1996 tax liability is nondischargeable. 11 U.S.C. § 523(a)(1)(A).

### 1982–1995 Taxes

The IRS concedes Debtors tax liability for years 1982 through 1995 is dischargeable under 11 U.S.C. § 523(a)(1)(A). The only avenue for nondischargeability for the taxes in question is for the Court to find Debtors willfully attempted to evade or defeat the taxes in accordance with 11 U.S.C. § 523(a)(1)(C). The IRS concedes the burden of proof to establish Debtors taxes fit within § 523(a)(1)(C) is theirs. In support of the § 523(a)(1)(C) claim, the IRS asserts the Debtors alleged conduct in manipulating the number of exemptions on the forms W4 is sufficient to establish the elements of § 523(a)(1)(C).

■ The Eleventh Circuit holds § 523(a)(1)(C) contains both a conduct and mental state requirement. Thus, Debtors must have willfully *acted* in an attempt to evade or defeat the tax. These requirements are most recently defined as follows:

> To summarize, as the law of this circuit now stands, the conduct requirement of § 523(a)(1)(C) is not satisfied where a

debtor has filed accurate tax returns and simply failed to pay taxes as the debtor in *[In re] Haas* did. 48 F.3d [1153] at 1157 [(11th Cir.1995)] ("The omission of the words 'or the payment thereof' from section 523(a)(1)(C) ... indicates that Congress did not intend that a failure to pay taxes, without more, should result in the nondischargeability of a debtor's tax liabilities in bankruptcy."). The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes as the debtor in *[In re] Griffith* did. 206 F.3d [1389] at 1393–96 [(11th Cir.2000)].

. . . .

As for the mental state requirement, a debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally.... Fraudulent intent is not required.... Thus, all the government must prove is that [Debtors]:

(1) had a duty to file income tax returns and pay taxes;

(2) knew he had such a duty; and

(3) voluntarily and intentionally violated that duty..... The third or willfulness component of the mental state requirement "prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate."

*In re Fretz,* 244 F.3d 1323, 1328 –1329 (11th Cir.2001).[4]

### THE HOYT TAX SHELTER SAGA

■ In researching this opinion, the Court discovered the Hoyt tax shelters Debtors were involved in is the subject of numerous rulings by other federal courts,

---

**4.** For the reasons stated in detail in *Pert v. United States, (In re Pert),* 248 B.R. 659, 664 – 667 (Bankr.M.D.Fla.2000), this Court finds the mental state requirement problematic.

including bankruptcy, tax and criminal court rulings involving Hoyt, his partners and some of the thousands of taxpayers, like the Debtors, who bought into his scheme. Initially, the Court must mention the United States Tax Court opinion in *Bales v. Comm'r. of IRS*, T.C. Memo.1989–568, 1989 WL 123005 (U.S.Tax Ct.1989), which rules with regard to a substantially similar Hoyt limited partnership:

> In summary, we have decided that the transaction in issue should be respected for Federal income tax purposes. The expenses incurred by the partnerships are allowed to the extent set forth herein. In addition, petitioners are permitted their allowable share of partnership items (as previously discussed). Any losses claimed by the petitioners from the partnerships are allowed to the extent of the partner's individual basis.

*Id.* Thus, after Debtors receive the first IRS letter in 1989, Hoyt receives a favorable ruling on the limited partnerships. Recall, Debtors first letter regarding freezing their refunds does not arrive until February 19, 1993.

Obviously, at some point the tide turned in the opposite direction with regard to the legitimacy of the Hoyt tax shelters. The United States Tax Court entered the following detailed history of Hoyt's tax shelters:

> *Walter J. Hoyt III and the Hoyt Partnerships* The accuracy-related penalty at issue in this case arises from an adjustment of a partnership item on petitioners' 1991 Federal income tax return. This adjustment is the result of petitioners' involvement in certain partnerships organized and promoted by Walter J. Hoyt III (Mr. Hoyt).
>
> Mr. Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United States. In order to expand his business and attract investors, Mr. Hoyt's father had started organizing and promoting cattle breeding partnerships by the late 1960s. Before and after his father's death in early 1972, Mr. Hoyt and other members of the Hoyt family were extensively involved in organizing and operating numerous cattle breeding partnerships. From about 1971 through 1998, Mr. Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships. Mr. Hoyt also organized and operated sheep breeding partnerships in essentially the same fashion as the cattle breeding partnerships (collectively the "investor partnerships" or "Hoyt partnerships"). Each of the investor partnerships was marketed and promoted in the same manner.
>
> Beginning in 1983, and until removed by this Court due to a criminal conviction, Mr. Hoyt was the tax matters partner of each of the investor partnerships that are subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. 97–248, 96 Stat. 324. As the general partner managing each partnership, Mr. Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each return. Mr. Hoyt also operated tax return preparation companies, variously called "Tax Office of W.J. Hoyt Sons", "Agri–Tax", and "Laguna Tax Service", that prepared most of the investors' individual tax returns during the years of their investments. Petitioners' 1991 return was prepared in this manner and was signed by Mr. Hoyt. From approximately 1980 through 1997, Mr. Hoyt was a licensed enrolled agent, and as such he represented many of the investor-partners before the Internal Revenue Ser-

vice (IRS) before he was disbarred as enrolled agent in 1998.

Beginning in February 1993, respondent generally froze and stopped issuing income tax refunds to partners in the investor partnerships. The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would disallow the tax benefits that the partners claimed on their individual returns from the investor partnerships, and the IRS would not issue any tax refunds these partners might claim attributable to such partnership tax benefits.

Also beginning in 1993, an increasing number of investor-partners were becoming disgruntled with Mr. Hoyt and the Hoyt organization. Many partners stopped making their partnership payments and withdrew from their partnerships, due in part to respondent's tax enforcement. Mr. Hoyt urged the partners to support and remain loyal to the organization in challenging the IRS's actions. The Hoyt organization warned that partners who stopped making their partnership payments and withdrew from their partnerships would be reported to the IRS as having substantial debt relief income, and that they would have to deal with the IRS on their own.

On June 5, 1997, a bankruptcy court entered an order for relief, in effect finding that W.J. Hoyt Sons Management Company and W.J. Hoyt Sons MLP were both bankrupt. In these bankruptcy cases, the U.S. Trustee moved in 1997 to have the bankruptcy court substantively consolidate all assets and liabilities of almost all Hoyt organization entities and the many Hoyt investor partnerships. This consolidation included all the investor partnerships. On November 13, 1998, the bankruptcy court entered its Judgment for Substantive Consolidation, consolidating all the above-mentioned entities for bankruptcy purposes. The trustee then sold off what livestock the Hoyt organization owned or managed on behalf of the investor partnerships. Mr. Hoyt and others were indicted for certain Federal crimes, and a trial was conducted in the U.S. District Court for the District of Oregon. The District Court described Mr. Hoyt's actions as "the most egregious white collar crime committed in the history of the State of Oregon." Mr. Hoyt was found guilty on all counts, and as part of his sentence in the criminal case he was required to pay restitution in the amount of $102 million. This amount represented the total amount that the United States determined, using Hoyt organization records, was paid to the Hoyt organization from 1982 through 1998 by investor-partners in various investor partnerships.

*Hansen v. Comm'r of IRS*, T.C. Memo. 2004–269, 2004 WL 2677035 (U.S.Tax Ct.2004)(holding accuracy related penalty for negligence on part of taxpayer permissible where taxpayers reliance on Hoyt and his tax preparation entities was negligent). There are several recent written opinions almost identical to *Hansen* involving the Tax Court upholding accuracy related penalties against Hoyt tax shelter investors. *See, e.g., Mortensen v. Comm.'r of IRS*, T.C. Memo.2004–279, 2004 WL 2900972 (U.S.Tax Ct.2004).

While the facts in these cases are incredibly similar to the facts before the Court, and the individual taxpayer/investors are repeatedly found to be negligent in their reliance on Hoyt's representations, the Court was unable to find even one case holding an investor acted in a willfull manner to evade or defeat a tax by following Hoyt's advice. Further, the penalties and adjustments addressed are all based on negligence, not civil or criminal tax fraud.

As suggested in the warning letters received by Debtors, the investors in the tax cases are penalized for accuracy related deficiencies for their negligence.

### DEBTORS' FORMS W4

■ The Court reviewed all of the cases offered by the IRS in support of its contention that taken on its own, the act of altering W–4's to include more exemptions is sufficient to find the taxes nondischargeable. In every case cited by the IRS to the Court, there is conduct in addition to the W–4 issue. The Court's own review of cases in this area revealed no instances where a Court found claiming too many exemptions on a W–4 is a sufficient act to establish a willful attempt to evade or defeat a tax absent other acts in either the bankruptcy or the tax case law.

Looking to the factual record in this case on the issue of increasing the number of exemptions on the W4, the Court first notes an absence of any forms W4 signed by the Debtors. The Court also notes IRS Revenue Officer Zacek's testimony that taxpayers are free to claim as many exemptions as they would like, but will face consequences in the form of penalties if they are unable to pay. Mr. Zacek indicates the IRS is generally concerned when 10 or more exemptions are claimed, which is certainly not the case here. This record reflects Debtors withheld some of their wages every year, and even met the 10% threshold the IRS suggested is necessary at trial in some years with regard to Debtor Edward Wargo. The Court notes the IRS offers no specific legal requirement for the 10% figure as a threshold indicator of abuse, and the IRS's own witness testified there is a relatively simple table to calculate 90% of the potential tax. In this case, the Debtors repeatedly testified they did not anticipate they owed any tax, nor did they intentionally seek to raise their

exemptions in order to keep money owed to the IRS from the IRS. *Compare Cheek v. United States,* 498 U.S. 192, 194, 111 S.Ct. 604, 112 L.Ed.2d 617, (1991) ("[Taxpayer] also claimed an increasing number of withholding allowances—eventually claiming 60 allowances by mid–1980—and for the years 1981 to 1984 indicated on his W–4 forms that he was exempt from federal income taxes.")

### CONCLUSION

The Court finds it need not decide whether increasing exemptions claimed on a form W4 is ever sufficient on its own to establish the conduct requirement of § 523(a)(1)(C). Instead, the Court finds the Debtors admitted act of signing the Hoyt prepared forms W4 containing increased exemptions in order to decrease their withholding amounts is not sufficient on its own to reflect an attempt to evade or defeat a tax under the circumstances of this case. This is especially true as the Court finds the record in this case is devoid of any evidence the Debtors intentionally ignored a known legal duty, or voluntarily, consciously or knowingly and intentionally attempted to evade or defeat the tax liability for tax years 1982 through 1995. Thus, the IRS failed to meet its burden with regard to the mental state requirement of § 523(a)(1)(C). With regard to whether increasing exemptions claimed on a form W4 is ever sufficient on its own to establish the conduct requirement of § 523(a)(1)(C), the Court need not rule. Accordingly, it is

ORDERED, ADJUDGED, AND DECREED the Plaintiffs/Debtors taxes for the years 1982 through 1995 consecutively are dischargeable. The Court shall enter a separate judgment in favor of Debtors Edward M. and Linda Wargo on this issue. It is further

ORDERED, ADJUDGED AND DE-CREED the Debtors taxes for the year 1996 are not dischargeable. The Court shall enter a separate judgment in favor of the Defendant, United States of America on this issue.

## FINAL JUDGMENT

This case came on for trial before the Court, the Honorable Thomas E. Baynes, Jr., presiding, and the issues having been duly tried and a decision having been duly rendered, it is

ORDERED, ADJUDGED, AND DE-CREED that the tax liabilities of Plain-tiffs/Debtors Edward M. and Linda Wargo for the tax years 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, and 1995 are discharged. It is further

ORDERED, ADJUDGED AND DE-CREED that the tax liabilities of Plain-tiffs/Debtors Edward M. and Linda Wargo for the tax year 1996 are not discharged.